FILED

CLERK U.S. DISTRICT COURT
CENTRAL DIST. OF CALIF.
LOS ANGELES

2013 JAN 22  PM 4: 17

UNITED STATES DISTRICT COURT

FOR THE CENTRAL DISTRICT OF CALIFORNIA

February 2012 Grand Jury

| | |
|---|---|
| UNITED STATES OF AMERICA, | CR No. **CR13-0048** |
| Plaintiff, | |
| v. | I N D I C T M E N T |
| REGIS POSSINO,<br>GROVER HENRY COLIN NIX IV,<br>   aka "Colin Nix,"<br>TARUN MENDIRATTA,<br>IVANO ANGELASTRI,<br>MARK HARRIS,<br>EDON MOYAL,<br>JOSEPH SCARPELLO,<br>JULIAN SPITARI,<br>PETER DUNN,<br>WILLIAM MACKEY, and<br>JOSEPH DAVIS,<br>   aka "Joey Davis,"<br><br>         Defendants. | [18 U.S.C. § 371: Conspiracy;<br>18 U.S.C. § 1348(1): Securities<br>Fraud; 15 U.S.C. §§ 78j(b),<br>78ff(a), 17 C.F.R. § 240.10b-5:<br>Securities Fraud; 18 U.S.C.<br>§ 1343: Wire Fraud; 18 U.S.C.<br>§ 1350: Willful Certification of<br>False Financial Report; 18 U.S.C.<br>§ 1956(h): Money Laundering<br>Conspiracy; 18 U.S.C.<br>§ 1956(a)(2)(A): International<br>Promotional Money Laundering;<br>18 U.S.C. § 1956(a)(1)(B)(i):<br>Concealment Money Laundering;<br>18 U.S.C. § 3147: Commission of<br>Offense While on Pretrial Release;<br>18 U.S.C. §§ 981(a)(1)(A) & (C),<br>28 U.S.C. § 2461(c), 18 U.S.C.<br>§§ 982(a)(1) & (2): Criminal<br>Forfeiture; 18 U.S.C. § 2: Aiding<br>And Abetting and Causing an Act to<br>Be Done] |

JAB:JAB

<u>**TABLE OF CONTENTS**</u>

PAGE

INTRODUCTORY ALLEGATIONS . . . . . . . . . . . . . 1

   A.   SUMMARY OF THE FRAUD . . . . . . . . . . 1

   B.   THE DEFENDANTS . . . . . . . . . . . . . 1

   C.   UNINDICTED CO-CONSPIRATORS . . . . . . . 3

   D.   THE MANIPULATED STOCKS . . . . . . . . 3

   E.   SECURITIES ENFORCEMENT, LAWS, REGULATIONS,
       RULES, AND MARKETS . . . . . . . . . . 4

   F.   MARKET MANIPULATION SCHEMES . . . . . . 7

       1.   First Phase: Obtaining and Concealing Control
           and Ownership of a Public Company's Free
           Trading Shares . . . . . . . . . . . 7

       2.   Second Phase: Fraudulently Inflating the Price
           and Trading Volume of the Company's Stock . . . 8

       3.   Third Phase: Coordinated Selling of the
           Company's Stock . . . . . . . . . . 9

COUNT ONE
[18 U.S.C. § 371]
[Conspiracy] . . . . . . . . . . . . . . . 11

   A.   THE OBJECTS OF THE CONSPIRACY . . . . . . . 11

   B.   THE MANNER AND MEANS OF THE CONSPIRACY . . . . . 12

       1.   Obtaining and Concealing Control and
           Ownership of the Manipulated Companies'
           Stocks . . . . . . . . . . . . . 12

       2.   Fraudulently Inflating the Price and Trading
           Volume of the Manipulated Companies' Stocks . 14

       3.   Coordinated Selling of the Manipulated
           Companies' Stocks . . . . . . . . . 17

   C.   OVERT ACTS . . . . . . . . . . . . . 18

       1.   Overt Acts Regarding Sport Endurance. . . . 18

       2.   Overt Acts Regarding Imobolis/FrogAds. . . . 23

       3.   Overt Acts Regarding Empire. . . . . . . 31

i

        4.    Additional Overt Acts Regarding the Scheme to
              Manipulate the Stocks of Public Companies  . .  37

COUNT TWO
[18 U.S.C. § 1348(1)]
[Securities Fraud]  . . . . . . . . . . . . . .  42

COUNT THREE
[18 U.S.C. § 1348(1)]
[Securities Fraud]  . . . . . . . . . . . . . .  43

COUNT FOUR
[18 U.S.C. § 1348(1)]
[Securities Fraud]  . . . . . . . . . . . . . .  44

COUNTS FIVE THROUGH SIXTEEN
[15 U.S.C. §§ 78j(b), 78ff; 17 C.F.R. § 240.10b-5]
[Securities Fraud]  . . . . . . . . . . . . . .  45

COUNTS SEVENTEEN THROUGH TWENTY-TWO
[18 U.S.C. § 1343]
[Wire Fraud]  . . . . . . . . . . . . . . . . .  49

     A.    THE SCHEME TO DEFRAUD . . . . . . . . .  49

     B.    USE OF THE WIRES  . . . . . . . . . . .  49

COUNTS TWENTY-THREE THROUGH TWENTY-FIVE
[18 U.S.C. § 1350]
[Willful Certification of False Financial Report] . . . . . .  52

COUNT TWENTY-SIX
[18 U.S.C. § 1956(h)]
[Money Laundering Conspiracy]  . . . . . . . . .  54

     A.    THE OBJECT OF THE CONSPIRACY  . . . . .  54

     B.    THE MANNER AND MEANS OF THE CONSPIRACY  . . . . .  55

     C.    OVERT ACTS. . . . . . . . . . . . . . .  55

COUNTS TWENTY-SEVEN THROUGH THIRTY-THREE
[18 U.S.C. § 1956(a)(2)(A)]
[International Promotional Money Laundering]  . . . . . . . .  56

ii

COUNTS THIRTY-FOUR THROUGH THIRTY-SEVEN
[18 U.S.C. § 1956(a)(1)(B)(i)]
[Concealment Money Laundering]  . . . . . . . . .   59

ADDITIONAL SENTENCING ENHANCEMENT
[18 U.S.C. § 1347]
[Commission of Offense While on Pretrial Release] . . . . . .   61


FORFEITURE ALLEGATION ONE
[18 U.S.C. § 981(a)(1)(C), 28 U.S.C. § 2461(c) and
18 U.S.C. § 982(a)(2)]
[Criminal Forfeiture of Proceeds Obtained From
Conspiracy, Securities Fraud, and Wire Fraud] . . . . . . . .   63


FORFEITURE ALLEGATION TWO
[18 U.S.C. § 981(a)(1)(A), 28 U.S.C. § 2461(c) and
18 U.S.C. § 982(a)(1)]
[Criminal Forfeiture of Property Involved in Money
Laundering] . . . . . . . . . . . . . . . . . . . . .   65

INTRODUCTORY ALLEGATIONS

A.   SUMMARY OF THE FRAUD

1.   Beginning on a date unknown to the Grand Jury but at least as early as in or about June 2009, and continuing through at least in or about December 2012, within the Central District of California and elsewhere, defendants REGIS POSSINO ("POSSINO"), GROVER HENRY COLIN NIX IV, also known as ("aka") "Colin Nix" ("NIX"), TARUN MENDIRATTA ("MENDIRATTA"), IVANO ANGELASTRI ("ANGELASTRI"), MARK HARRIS ("HARRIS"), EDON MOYAL ("MOYAL"), JOSEPH SCARPELLO ("SCARPELLO"), JULIAN SPITARI ("SPITARI"), PETER DUNN ("DUNN"), WILLIAM MACKEY ("MACKEY"), and JOSEPH DAVIS, aka "Joey Davis" ("DAVIS"), together with others known and unknown to the Grand Jury, perpetrated a multi-million dollar scheme to fraudulently inflate the prices and trading volumes of public company stocks and then sell millions of shares of those companies at the fraudulently inflated prices to the investing public for substantial profits.

B.   THE DEFENDANTS

2.   At all times relevant to this Indictment:

a.   Defendant POSSINO resided in Pacific Palisades, California.  Defendant POSSINO controlled, among other companies and entities, Calbridge Capital, LLC ("Calbridge Capital"), which purported to be a "boutique investment banking firm" with offices in Santa Monica, California.

b.   Defendant NIX, resided in Los Angeles, California. Defendant NIX was defendant POSSINO's business partner at Calbridge Capital.

///

1

c.   Defendants POSSINO and NIX owned and controlled various entities, including but not limited to SLC Air, Inc. ("SLC Air"); Trilogy Expedition, Inc. ("Trilogy Expedition"); Wellington Manor Holdings, Inc. ("Wellington Manor"); October Funds, Ltd. ("October Funds"); Rancho Malibu, Inc. ("Rancho Malibu"); and Black Napkin, Inc. ("Black Napkin").

d.   Defendant MENDIRATTA resided in Weston, Connecticut.  Defendant MENDIRATTA controlled Interstellar Holdings, LLC ("Interstellar Holdings") and Fox and Hound 1901, LLC ("Fox and Hound").

e.   Defendant ANGELASTRI resided in Switzerland and Dubai.  Defendant ANGELASTRI was an investment manager who controlled Ebony Finance, Ltd. ("Ebony Finance"), Sula International, Ltd. ("Sula"), Serendipity Private Equity ("Serendipity"), and Steinhov Private Equity ("Steinhov"). Defendant ANGELASTRI controlled funds and securities in foreign accounts for himself and defendant MENDIRATTA, including brokerage and bank accounts in Switzerland and bank accounts in Liechtenstein.

f.   Defendant HARRIS resided in Scottsdale, Arizona. Defendant HARRIS was a stock promoter who controlled Apache Capital, LLC ("Apache Capital"), an investor relations firm with offices in Scottsdale, Arizona.

g.   Defendant MOYAL resided in Carlsbad, California. Defendant MOYAL controlled 8 Sounds, Inc. ("8 Sounds").

h.   Defendant SCARPELLO resided in Tustin, California. Defendant SCARPELLO was a disbarred attorney who controlled Taylor Financial, Ltd. ("Taylor Financial").

2

i.   Defendant SPITARI resided in Encino, California, and was the Chief Executive Officer ("CEO"), President, and a Director of Imobolis, Inc., a company that later changed its name to FrogAds, Inc.

j.   Defendant DUNN resided in Los Angeles, California, and was the CEO of Empire Post Media, Inc.

k.   Defendant MACKEY was a stock promoter who resided in Plantation, Florida.

l.   Defendant DAVIS resided in Los Angeles and Malibu, California.  Defendant DAVIS was the CEO and President of Scripted Consulting, a public relations firm with offices in Los Angeles, California.

C.   UNINDICTED CO-CONSPIRATORS

3.   At all times relevant to this Indictment:

a.   Unindicted Co-Conspirator 1 resided in Salt Lake City, Utah, and was the CEO of Sport Endurance, Inc. until in or about mid-December 2010.

b.   Unindicted Co-Conspirator 2 resided in Woodland Hills, California, and was an attorney for, among other clients, FrogAds, Inc. and Empire Post Media, Inc.

D.   THE MANIPULATED STOCKS

4.   At all times relevant to this Indictment:

a.   Sport Endurance, Inc. ("Sport Endurance") was a Nevada corporation with offices in Salt Lake City, Utah.  Sport Endurance purported to develop, manufacture, and distribute energy drinks and nutritional supplements.  Sport Endurance stock was quoted on the Over-The-Counter Bulletin Board ("OTCBB") under ///

3

1   the ticker symbol "SENZ" and began trading on or about June 16,
2   2010.
3           b.   Imobolis, Inc. ("Imobolis") was a Nevada
4   corporation with offices in Beverly Hills and Woodland Hills,
5   California, within the Central District of California.  Imobolis
6   purported to operate an internet bulletin board website for
7   online classified advertisements, in a manner similar to the
8   popular website craigslist.com.  Imobolis changed its name to
9   FrogAds on or about November 22, 2011 (hereinafter referred to as
10  "FrogAds").  FrogAds stock was alternatively quoted on the OTCBB
11  and the OTCQB and began trading on or about September 16, 2011.
12  FrogAds stock was initially traded under the ticker symbol
13  "IMOB," which was later changed to "FROG."
14          c.   Empire Post Media, Inc. ("Empire") was a Nevada
15  corporation with offices in Beverly Hills and Calabasas,
16  California, within the Central District of California.  Empire
17  purported to provide media services, including post-production
18  services for feature films and television programs.  Empire stock
19  was quoted on the OTCBB under the ticker symbol "EMPM" and began
20  trading on or about August 16, 2011.
21  E.  SECURITIES ENFORCEMENT, LAWS, REGULATIONS, RULES, AND
        MARKETS
22
23          5.   At all times relevant to this Indictment:
24          a.   The United States Securities and Exchange
25  Commission ("SEC") was an agency within the executive branch of
    the United States government.  The SEC enforced federal
26  securities laws, regulations, and rules governing the public
27  reporting of information about publicly traded companies.  Among
28  ///

1  other things, the purposes of these laws, regulations, and rules

2  were:

3                 i.   To disclose to the investing public all

4  material facts regarding the offer, purchase, and sale of public

5  company stocks; and

6                ii.   To protect the investing public by

7  maintaining fair and honest securities markets and prohibiting

8  manipulative practices that tend to distort the fair market

9  prices of stocks.

10          b.   These securities laws, regulations, and rules

11  required the following, among other things:

12                i.   Certain publicly traded companies, and the

13  officers of those companies, had a duty to file with the SEC

14  periodic reports, including financial statements that accurately

15  and fairly reported the companies' financial condition and the

16  results of their business operations.

17                ii.   Individuals and entities that controlled more

18  than a certain percentage of a company's shares had to report

19  their control of those shares to the SEC.  Under certain

20  circumstances, individuals and entities subject to this

21  requirement also had to report any change in their beneficial

22  ownership of the company's shares.  The reporting company was

23  also required to disclose in filings with the SEC certain

24  individuals and entities that held more than a certain percentage

25  of the company's shares.  One purpose of these requirements was

26  to enable potential investors in the company to accurately

27  evaluate the degree of centralization of the company's shares and

28  ///

the identities of individuals who could exercise influence over the company and its shares.

iii. In certain circumstances, individuals and entities that were paid to promote or recommend a company's stock to the investing public were required to disclose to the SEC the type, amount, and source of the compensation that they received. Additionally, in certain circumstances, a publicly traded company that paid a promoter to promote or recommend the company's stock had to disclose the terms of the promoter's engagement in the company's public filings with the SEC, including any compensation that was paid to the promoter.

c.   The Financial Industry Regulatory Authority ("FINRA") was an independent regulator for securities firms doing business in the United States.   FINRA oversaw brokerage firms and wrote and enforced rules governing their conduct.

d.   The OTCBB was a regulated quotation service operated by FINRA that showed real-time quotes, last-sales prices, and trading volume information for securities not generally listed on a national securities exchange.   The OTCQB was a marketplace operated by OTC Markets Group Inc. that showed real-time quotes and trading volume information for OTC-traded companies.   Companies quoted on the OTCBB and on the OTCQB were subject to periodic filing requirements with the SEC or other regulatory authorities.

e.   The Depository Trust Company ("DTC") was a securities depository and clearing agency that settled trades in securities.   One of the services provided by the DTC was the "Deposit and Withdrawal at Custodian" program ("DWAC"), which

1  facilitated the electronic transfer of securities between brokers

2  and accelerated the speed at which shares could be transferred

3  between buyers and sellers.

4  F.   MARKET MANIPULATION SCHEMES

5       6.   Market manipulation schemes known as "pump and dump"

6  schemes involve fraudulently inflating the price and trading

7  volume of public company stocks and then selling those stocks at

8  the fraudulently inflated prices to the investing public for a

9  profit.   There are generally three phases to a pump and dump

10  scheme:

11           a.   First, obtaining and concealing control of a

12  significant portion of a publicly traded company's stock;

13           b.   Second, fraudulently inflating the price and

14  trading volume of the company's stock through a variety of means;

15  and

16           c.   Third, once the price of the stock has been

17  fraudulently inflated, selling the stock at the fraudulently

18  inflated price, thereby profiting at the expense of the investing

19  public.

20       1.   First Phase: Obtaining and Concealing Control and
          Ownership of a Public Company's Free Trading Shares

21

22       7.   During the first phase, the perpetrators of a pump and

23  dump scheme obtain control over a substantial portion of the free

24  trading shares of a publicly traded company.   Generally, "free

25  trading" shares are shares of stock that the shareholder can

26  trade without restriction.   After they have acquired control over

27  a substantial portion of the company's free trading shares, the

28  perpetrators are poised to profit from selling those shares as

7

soon as the price and trading volume of the company's stock have been fraudulently inflated.

8.   The perpetrators of a pump and dump scheme usually take steps to conceal from the investing public their control over a substantial portion of the company's free trading shares. Ordinarily, the perpetrators would have to disclose their control of the company's stock to the public, to comply with the rules and regulations requiring disclosure of the identities of all shareholders who own or control more than a certain percentage (usually five percent) of the company's stock.  For that reason, among others, the perpetrators of pump and dump schemes often hide their control over the company's stock by purporting to transfer ownership of the shares to various nominee entities and individuals whom they, in fact, control.  Accordingly, even if they do not hold the shares in their own names, the perpetrators maintain their actual control over disposition of the shares.

2.   <u>Second Phase: Fraudulently Inflating the Price and Trading Volume of the Company's Stock</u>

9.   During the second phase, the perpetrators fraudulently inflate the price and trading volume of the company's stock.  The perpetrators typically use some or all of the following methods to generate interest in the company and fraudulently raise the price and trading volume of the company's stock:

a.   The perpetrators buy shares of the company's stock on the open market shortly before launching a promotion campaign (a technique known as "priming the pump"), to raise the price of the stock and create the false appearance that there is an increased market demand for the stock.

8

b.    Using accounts that they control (either in their own names or in the names of nominees), the perpetrators buy and sell the company's stock back and forth among themselves, often at increasingly higher prices (a technique known as "cross trading"), to create the false appearance that there is a high market demand for the stock.

c.    The perpetrators pay stock promoters and analysts to recommend the company's stock to the investing public. The promoters recommend the stock through a variety of methods, including mass mailings and emails, Internet chat rooms, television and internet advertising, celebrity endorsements, boiler room operations and telemarketers, and other media outlets. The analysts, who often purport to offer independent and unbiased analysis of the company's stock to the investing public, tout the stock as underpriced, issue "buy" recommendations, and set unrealistically high target prices for the stock.

d.    The perpetrators, often including complicit officers at the company, issue false and misleading press releases to generate investor interest in the company's stock, including statements that inflate the company's projected revenues and expected earnings; exaggerate the nature and scope of business activities and operations; and misrepresent intentions to hire additional employees and develop new products.

3.    Third Phase: Coordinated Selling of the Company's Stock

10.   During the third phase, the perpetrators sell their shares of the company's stock in coordination to maximize their fraudulent profits from the scheme. This coordinated selling

often causes the price of the stock to drop significantly,
leaving investors who were deceived into buying the company's
stock at the fraudulently inflated price holding shares worth
substantially less than what the investors had paid for them.

## COUNT ONE

[Defendants POSSINO, NIX, MENDIRATTA, ANGELASTRI, HARRIS, MOYAL,
SCARPELLO, SPITARI, DUNN, MACKEY, and DAVIS]

[18 U.S.C. § 371]

[Conspiracy]

11.   The Grand Jury hereby realleges and incorporates by
reference paragraphs 1 through 10 of this Indictment as though
fully set forth herein.

A.   THE OBJECTS OF THE CONSPIRACY

12.   Beginning on a date unknown to the Grand Jury but at
least as early as in or about June 2009, and continuing through
at least in or about December 2012, in Los Angeles County, within
the Central District of California, and elsewhere, defendants
POSSINO, NIX, MENDIRATTA, ANGELASTRI, HARRIS, MOYAL, SCARPELLO,
SPITARI, DUNN, MACKEY, and DAVIS, together with others known and
unknown to the Grand Jury, knowingly combined, conspired, and
agreed to commit the following offenses against the United
States:

a.   Securities fraud, in violation of Title 18, United
States Code, Section 1348(1);

b.   Securities fraud, in violation of Title 15, United
States Code, Sections 78j(b) and 78ff, and Title 17, Code of
Federal Regulations, Section 240.10b-5; and

c.   Wire fraud, in violation of Title 18, United
States Code, Section 1343.

///

///

///

11

B.   THE MANNER AND MEANS OF THE CONSPIRACY

13.   The objects of the conspiracy were carried out, and to be carried out, in substance, as follows:

1.   Obtaining and Concealing Control and Ownership of the Manipulated Companies' Stocks

14.   Defendants POSSINO, NIX, and MENDIRATTA, together with others known and unknown to the Grand Jury, identified publicly traded companies and small private companies that would be suitable candidates for fraudulent market manipulation campaigns (hereinafter "manipulation campaigns"), and then took steps to obtain secret control over all, or a substantial portion, of those companies' free trading shares, through the following methods, among others:

a.   In cases involving publicly traded companies, including but not limited to Empire, defendants POSSINO, NIX, and MENDIRATTA arranged with the majority owners of the companies, including defendant DUNN, to take control over all, or a substantial portion, of the companies' free trading shares. After they had obtained control of the companies' free trading shares, defendants POSSINO, NIX, and MENDIRATTA, together with others known and unknown to the Grand Jury, often arranged for the publicly traded companies to acquire private companies and assets.   In this process, defendants POSSINO, NIX, and MENDIRATTA focused on companies that they believed would be most likely to attract interest from investors, such as companies purportedly involved in green technologies, mining operations, entertainment, social media and e-commerce websites, and nutritional supplements.

12

          b.    In cases involving private companies, including
but not limited to Sport Endurance and FrogAds, defendants
POSSINO, NIX, and MENDIRATTA, together with others known and
unknown to the Grand Jury, arranged with the companies' owners,
including defendants SCARPELLO and SPITARI, to take control of
the companies' stock.   Defendants POSSINO, NIX, SCARPELLO, and
SPITARI, together with Unindicted Co-Conspirator 1, then
submitted and caused to be submitted false and misleading
information to the SEC concerning the company in order to
register the companies' stock for sale to the public and to FINRA
in order to have the companies' stock approved for quotation on
the OTCBB.

     15.  Defendants POSSINO, NIX, and MENDIRATTA, together with
others known and unknown to the Grand Jury, took steps to conceal
their ownership of the manipulated companies' stock by, among
other things:

          a.    Transferring shares to nominee entities and
individuals that they controlled, including but not limited to
Calbridge Capital, SLC Air, Trilogy Expedition, Wellington Manor,
October Funds, Interstellar Holdings, and Fox and Hound;

          b.    Transferring shares to nominee entities and
individuals who were controlled by other conspirators, including
but not limited to defendants ANGELASTRI and MACKEY, as
compensation for those conspirators' participation in the
conspiracy; and

          c.    Transferring shares to accounts in Switzerland
that defendant ANGELASTRI maintained on defendant MENDIRATTA's
behalf, in order to:

13

i.   Further conceal defendant MENDIRATTA's control of the shares; and

ii.   Frustrate and obstruct law enforcement's efforts to trace and seize any proceeds from the fraudulent sale of those shares.

16.   Before beginning a campaign to fraudulently manipulate the prices of publicly traded companies' stocks, including the stocks of Sport Endurance, FrogAds, and Empire, defendants POSSINO, NIX, MENDIRATTA, ANGELASTRI, SCARPELLO, SPITARI, DUNN, and MACKEY, together with others known and unknown to the Grand Jury, ensured that the conspirators secretly controlled a substantial majority, if not all, of the manipulated companies' free trading shares.

2.   <u>Fraudulently Inflating the Price and Trading Volume of the Manipulated Companies' Stocks</u>

17.   After obtaining secret control of the manipulated companies' free trading shares, defendants POSSINO, NIX, MENDIRATTA, ANGELASTRI, HARRIS, MOYAL, SCARPELLO, SPITARI, DUNN, MACKEY, and DAVIS, together with others known and unknown to the Grand Jury, used the following methods, among others, to generate interest in the companies and fraudulently inflate the price and trading volume of the companies' shares:

a.   Defendants POSSINO, NIX, and ANGELASTRI, together with others known and unknown to the Grand Jury, bought shares of the companies on the open market shortly before the promotion campaigns were launched.  To the investing public, these trades appeared to be purchases by investors not affiliated with the

///

14

1   companies, and gave the false appearance that there was an

2   increasing market demand for the shares.

3           b.    Defendants POSSINO, NIX, MENDIRATTA, and

4   ANGELASTRI secretly cross traded the companies' shares back and

5   forth between accounts that they controlled, in order to create

6   the false appearance that there was an active market for the

7   companies' shares so that:

8           i.    The DTC would approve the electronic transfer

9   of the shares through the DWAC program, thereby enabling the

10  conspirators to manipulate the shares' prices and trading volumes

11  more rapidly and effectively; and

12          ii.   The investing public would take interest in

13  the companies and purchase the shares.

14          c.    Defendants POSSINO, NIX, MENDIRATTA, ANGELASTRI,

15  HARRIS, MOYAL, SPITARI, DUNN, MACKEY, and DAVIS, together with

16  others known and unknown to the Grand Jury, fraudulently promoted

17  the companies' stocks through the following means, among others:

18          i.    Paying stock promoters, including defendants

19  HARRIS, MACKEY, and DAVIS, to tout the companies' performance and

20  prospects, including through mass emails and mailings, television

21  and internet advertisements, celebrity endorsements, promotional

22  events, infomercials, and other media outlets;

23          ii.   Giving, and offering to give, defendants

24  MENDIRATTA, ANGELASTRI, MOYAL, and MACKEY, as well as others

25  known and unknown to the Grand Jury, shares of the companies, or

26  a portion of the profits from the manipulation campaigns, in

27  exchange for funding the promotion campaigns; and

28  ///

1    iii. Paying stock analysts and recommendation

2  websites, many of which purported to offer independent and

3  unbiased analyses of companies' stocks, to recommend the

4  companies as favorable investments. Defendants POSSINO, NIX,

5  MENDIRATTA, ANGELASTRI, HARRIS, and MOYAL took steps to conceal

6  from the public that they were the source of the funds paid to

7  these stock analysts and recommendation websites.

8    d.    Defendants POSSINO, NIX, MENDIRATTA, ANGELASTRI,

9  SCARPELLO, and DAVIS worked with certain officers at the

10  companies, including but not limited to defendants SPITARI and

11  DUNN, and Unindicted Co-Conspirator 1, to issue press releases

12  that the defendants knew contained materially false and

13  misleading information, and omitted material information

14  necessary to make the press releases not false and misleading,

15  regarding:

16    i.    The companies' business operations, products

17  that the companies had supposedly developed or were developing,

18  hiring of new employees, projected earnings, and growth

19  potential;

20    ii.    The defendants' ownership and control,

21  through various nominees, of a substantial portion of the free

22  trading shares of the manipulated companies' stocks;

23    iii.    The defendants' payments to promoters to

24  tout the manipulated companies' stocks;

25    iv.    The defendants' artificial manipulation of

26  the price and trading volume of the manipulated companies' stocks

27  through, among other methods, cross trading shares of the

28  ///

16

1  manipulated companies between accounts that the defendants

2  controlled; and

3              v.   The defendants' intention to sell their

4  shares of the manipulated companies' stocks at the same time that

5  they were paying promoters to encourage the investing public to

6  buy and hold shares of those companies' stocks.

7      3.   Coordinated Selling of the Manipulated Companies'
           Stocks

8  18.   After fraudulently inflating the price of the

9  companies' stock, defendants POSSINO, NIX, MENDIRATTA,

10 ANGELASTRI, SCARPELLO, DUNN, and MACKEY, together with others

11 known and unknown to the Grand Jury, sold their shares to

12 unsuspecting victim investors at the fraudulently inflated

13 prices, thereby generating substantial illegal profits.

14 Defendants POSSINO, NIX, MENDIRATTA, and ANGELASTRI, together

15 with others known and unknown to the Grand Jury, also

16 transferred, and caused to be transferred, proceeds from selling

17 the shares to accounts in the names of nominee entities and

18 individuals, as well as to other conspirators, including but not

19 limited to defendants MOYAL and SCARPELLO.

20 19.   Defendants and their co-conspirators generated at least

21 $18 million in illegal proceeds from selling their shares of the

22 manipulated companies.  This included, but was not limited to,

23 illegal proceeds from the following manipulation campaigns:

24             a.   From the manipulation campaign for Sport Endurance

25 stock, defendants and their co-conspirators generated at least

26 $1 million in illegal proceeds.

27 ///

28

b.    From the manipulation campaign for FrogAds stock, defendants and their co-conspirators generated at least $6.8 million in illegal proceeds.

c.    From the manipulation campaign for Empire stock, defendants and their co-conspirators generated at least $1 million in illegal proceeds.

C.    OVERT ACTS

20.    In furtherance of the conspiracy and to accomplish its objects, defendants POSSINO, NIX, MENDIRATTA, ANGELASTRI, HARRIS, MOYAL, SCARPELLO, SPITARI, DUNN, MACKEY, and DAVIS, together with others known and unknown to the Grand Jury, committed, willfully caused others to commit, and aided and abetted the commission of the following overt acts, among others, in the Central District of California and elsewhere:

1.    Overt Acts Regarding Sport Endurance

Overt Act 1: On or about August 4, 2010, defendant MENDIRATTA told an anticipated participant in the conspiracy ("Person A") that defendant MENDIRATTA had six million shares of Sport Endurance stock.  Defendant MENDIRATTA offered Person A half of those shares if Person A would fund a portion of the promotion campaign to tout the company as a favorable investment.

Overt Act 2: On or about August 4, 2010, defendant MENDIRATTA told Person A that (a) defendant MENDIRATTA was using twelve different promoters to tout Sport Endurance stock; and (b) defendant ANGELASTRI had wired the money to the promoters to pay them.

Overt Act 3: On or about August 5, 2010, defendant ANGELASTRI caused an international wire transfer of approximately

18

$29,968.29 from an account in Liechtenstein to Stock Promotion Group, LLC for the purpose of promoting Sport Endurance stock.

Overt Act 4: On or about August 5, 2010, defendant ANGELASTRI cross traded 10,000 shares of Sport Endurance from an account that he controlled at UBS AG Zurich Investment Bank in Switzerland, to another account that he controlled at Aargauische Kantonal Bank in Switzerland.

Overt Act 5: On or about August 9, 2010, Unindicted Co-Conspirator 1 caused the dissemination of a press release announcing that Sport Endurance had hired a national sales force and projecting that the company's gross sales through 2011 would exceed $7.5 million.

Overt Act 6: On or about August 11, 2010, defendant ANGELASTRI cross traded 15,000 shares of Sport Endurance from an account that he controlled at UBS AG Zurich Investment Bank in Switzerland, to another account that he controlled at Aargauische Kantonal Bank in Switzerland.

Overt Act 7: On or about August 11, 2010, defendant MENDIRATTA told Person A that defendant MENDIRATTA and his partners wanted to raise the price of Sport Endurance stock, which at that time was trading at approximately 38 cents per share, to over 50 cents per share on the first day of the promotion campaign and to over 70 cents per share by the end of the third day of the campaign.

Overt Act 8: Between on or about August 11, 2010, and on or about August 17, 2010, defendants MENDIRATTA and ANGELASTRI caused multiple stock promotion websites to tout Sport Endurance as a favorable investment.

19

1          Overt Act 9: On or about August 12, 2010, defendants
2    POSSINO and NIX caused a stock analyst to issue a report
3    recommending Sport Endurance as an attractive investment, with a
4    target price for the company's stock that was 450 percent higher
5    than its then-current market price.

6          Overt Act 10: On or about August 16, 2010, Unindicted
7    Co-Conspirator 1 caused the dissemination of a press release
8    announcing that Sport Endurance had developed a "revolutionary"
9    formula that allowed for safer consumption of creatine, a muscle-
10   building dietary supplement.

11         Overt Act 11: Between on or about August 11, 2010, and
12   on or about August 30, 2010, defendant MENDIRATTA, using a
13   brokerage account in the name of Interstellar Holdings, sold
14   approximately 500,000 shares of Sport Endurance.

15         Overt Act 12: Between on or about August 11, 2010, and
16   on or about August 24, 2010, defendants POSSINO and NIX, using a
17   brokerage account in the name of October Funds, sold
18   approximately 393,000 shares of Sport Endurance.

19         Overt Act 13: Between on or about August 11, 2010, and
20   on or about August 24, 2010, defendant SCARPELLO sold
21   approximately 65,000 shares of Sport Endurance.

22         Overt Act 14: Between on or about August 12, 2010, and
23   on or about August 13, 2010, defendant ANGELASTRI, using
24   brokerage accounts located in Switzerland, sold approximately
25   475,000 shares of Sport Endurance.

26         Overt Act 15: On or about September 2, 2010, defendant
27   NIX told defendant POSSINO, defendant ANGELASTRI, and Person A
28   ///

1    that defendant NIX, defendant POSSINO, and their partners

2    controlled "every single share" of Sport Endurance.

3         Overt Act 16: On or about September 2, 2010, defendant

4    POSSINO told defendant NIX, defendant ANGELASTRI, and Person A

5    that (a) defendant POSSINO expected that they would receive a

6    return between three to six times the amount that they would pay

7    promoters to tout Sport Endurance; (b) defendant POSSINO spoke

8    with Unindicted Co-Conspirator 1 "every day"; and (c) Unindicted

9    Co-Conspirator 1 was "on the same page" with what defendant

10   POSSINO and his partners were doing with Sport Endurance's stock.

11        Overt Act 17: On or about September 8, 2010, defendant

12   ANGELASTRI informed Person A about the progress of the

13   manipulation campaign, stating that defendant POSSINO needed to

14   make "a real story out of the company" so "there can be much more

15   buying [of the stock] behind it."

16        Overt Act 18: On or about October 12, 2010, defendants

17   POSSINO and NIX told Person A that they controlled approximately

18   14 million shares of Sport Endurance through Calbridge Capital

19   and other nominee entities.  Defendant POSSINO also told Person A

20   that they had split up blocks of shares among different entities

21   "to make sure that we didn't go over a certain percentage."

22        Overt Act 19: On or about October 12, 2010, defendant

23   SCARPELLO described to Person A how shares of Sport Endurance had

24   been transferred among different entities that were controlled by

25   defendants POSSINO and NIX.

26        Overt Act 20: On or about October 14, 2010, defendant

27   ANGELASTRI caused an international wire transfer of approximately

28   ///

$99,972.65 from an account in Liechtenstein to defendant HARRIS for the purpose of promoting Sport Endurance.

Overt Act 21: On or about October 19, 2010, Unindicted Co-Conspirator 1 caused the dissemination of a press release announcing that Sport Endurance projected revenues of (a) more than $1 million for the fourth quarter of 2010; (b) more than $7.4 million in 2011; and (c) more than $38.7 million by 2013.

Overt Act 22: On or about October 21, 2010, Unindicted Co-Conspirator 1 caused the dissemination of a press release announcing that (a) Sport Endurance had three gel cap products that were being distributed across the country; and (b) the company had started development of a new weight loss gel cap product.

Overt Act 23: On or about October 26, 2010, defendant ANGELASTRI caused an international wire transfer of approximately $99,972.79 from an account in Liechtenstein to defendant HARRIS for the purpose of promoting Sport Endurance.

Overt Act 24: Between on or about October 14, 2010, and on or about November 9, 2010, defendant MENDIRATTA, using a brokerage account in the name of Interstellar Holdings, sold approximately 330,000 shares of Sport Endurance.

Overt Act 25: Between on or about October 20, 2010, and on or about October 22, 2010, defendant SCARPELLO sold approximately 130,000 shares of Sport Endurance.

Overt Act 26: Between on or about October 20, 2010, and on or about November 2, 2010, defendants POSSINO and NIX, using brokerage accounts in the name of Trilogy Expedition, sold approximately 5 million shares of Sport Endurance.

22

1    Overt Act 27: Between on or about November 2, 2010, and
2 on or about November 3, 2010, defendants POSSINO and NIX, using
3 brokerage accounts in the name of SLC Air, sold approximately
4 5 million shares of Sport Endurance.
5    Overt Act 28: Between on or about November 3, 2010, and
6 on or about November 15, 2010, defendants POSSINO and NIX, using
7 brokerage accounts in the name of Calbridge Capital, sold
8 approximately 1.2 million shares of Sport Endurance.
9    Overt Act 29: On or about November 5, 2010, defendant
10 POSSINO told Person A that defendant POSSINO and his partners had
11 recently completed a "campaign" to promote Sport Endurance, which
12 had cost them "a hundred thousand a week for a couple of weeks."
13    Overt Act 30: On or about November 5, 2010, defendant
14 POSSINO disclosed to Person A that the conspirators needed to
15 give the then-current CEO of Sport Endurance a buyout fee of
16 approximately $200,000 to "get him happy and let him move on down
17 the road."
18    2.   Overt Acts Regarding Imobolis / FrogAds
19    Overt Act 31: On or about October 1, 2010, defendants
20 POSSINO, NIX, and SCARPELLO met with Person A to persuade Person
21 A to participate in a manipulation campaign for Imobolis.
22 Defendant POSSINO told Person A that they were arranging for
23 Imobolis to register 8 million shares with the SEC, which they
24 would control after the shares were registered.
25    Overt Act 32: On or about October 1, 2010, defendant
26 SCARPELLO told Person A that approximately 8 million shares of
27 Imobolis would be sold to individuals who had no apparent
28 connection to the conspirators.  Defendant SCARPELLO explained

that with this approach, "there's no questions [from regulatory agencies] and there is no paper against you."

Overt Act 33: On or about October 1, 2010, defendant SCARPELLO told Person A that regulatory agencies, including the SEC and FINRA, would quickly approve Imobolis' registrations and applications as long as the nominee shareholders that they used were "clean" and not "bad guys."

Overt Act 34: On or about November 11, 2010, defendant POSSINO told Person A that after registering the shares of Imobolis with the SEC, the conspirators would arrange for Imobolis to acquire another company and then execute a five to one forward stock split in preparation for the manipulation campaign.

Overt Act 35: On or about November 11, 2010, in planning the manipulation campaign for Imobolis, defendant ANGELASTRI told Person A that defendant ANGELASTRI wanted his wife placed on Imobolis' Board of Directors before the manipulation campaign started because "I want to have control [over] what they do."

Overt Act 36: On or about November 11, 2010, in planning the manipulation campaign for Imobolis, defendant SCARPELLO told Person A that the 8 million shares of Imobolis would be sold to approximately forty nominees, which defendant SCARPELLO said was "the magic number last month with FINRA" in order to demonstrate that the stock was not controlled by a small number of shareholders.

Overt Act 37: On or about November 19, 2010, in planning the manipulation campaign for Imobolis, defendant

24

ANGELASTRI told Person A that certain funds could be routed through the company, and then booked as "revenue" from the company's business operations. Defendant ANGELASTRI said that the funds would come from Ebony Finance and that the advertising would supposedly be for "Barclay Technologies."

Overt Act 38: On or about November 19, 2010, defendants POSSINO, NIX, ANGELASTRI, SCARPELLO, and SPITARI discussed how they would falsely characterize funds provided to Imobolis as payments for advertising on the company's website. Defendant SCARPELLO assured his conspirators that he could come up with the companies to purportedly advertise on Imobolis' website if needed, and defendant SPITARI responded that defendant SPITARI would not have any problem justifying the claimed revenue as advertising on the website.

Overt Act 39: On or about November 26, 2010, defendant ANGELASTRI caused an international transfer of approximately $122,967 from an account in the name of Ebony Finance to Imobolis.

Overt Act 40: On or about January 26, 2011, defendants POSSINO, NIX, ANGELASTRI, MOYAL, SCARPELLO, and SPITARI, together with Person A, met at Calbridge Capital to plan the manipulation campaign for Imobolis. During the meeting, defendant SPITARI stated that (a) he wanted to open Imobolis for trading at $1 and then move the price up to $9; and (b) he would be able to issue press releases from the company each week to assist the promotion.

Overt Act 41: On or about January 26, 2011, defendant ANGELASTRI caused an international transfer of approximately

25

1 | $124,967 from an account in the name of Ebony Finance to

2 | Calbridge Capital.

3 |      Overt Act 42: On or about January 28, 2011, defendants

4 | POSSINO, NIX, SCARPELLO, and SPITARI caused to be filed with the

5 | SEC a Form S-1/A, which falsely claimed that Imobolis earned

6 | $123,000 in revenue from an advertising agreement with Ebony

7 | Finance on behalf of Barclay Technology.

8 |      Overt Act 43: On or about April 12, 2011, defendant

9 | HARRIS told defendant NIX: (a) defendant SPITARI was "arrogant

10 | enough" to tell the story properly (i.e., to present Imobolis as

11 | a company with good business prospects), but that the

12 | conspirators had to coach him properly; (b) the conspirators had

13 | to tell defendant SPITARI "here, smell this piece of shit, this

14 | is what it smells like, now go out and tell everybody about it

15 | ...."; and (c) when "you're dressing this thing up as a

16 | multimillion dollar deal, you gotta make sure that we have all

17 | our ducks in order."

18 |      Overt Act 44: On or about April 16, 2011, a third

19 | party, who was aware of the manipulation campaign for Imobolis

20 | and stood to profit from the manipulation of the company's stock,

21 | asked defendant NIX what the price of Imobolis stock was going to

22 | be after it was traded on the OTCBB.  Defendant NIX explained

23 | that it would be around one dollar, stating that he would "trade

24 | it back and forth, just to create a chart."  When that third

25 | party asked defendant NIX what his responsibility was regarding

26 | the stock, defendant NIX stated, "trade the stock, make a

27 | market," then added, "I will trade the stock and make it liquid

28 | ... make it worth something, turn stock into money."

26

1        Overt Act 45: On or about June 6, 2011, defendants
2    POSSINO and ANGELASTRI discussed cross trading Imobolis stock
3    back and forth between accounts they controlled.
4        Overt Act 46: On or about June 8, 2011, defendants
5    POSSINO, NIX, and MENDIRATTA discussed paying approximately
6    $1 million per month for the promotion of Imobolis stock, and
7    defendants NIX and MENDIRATTA discussed that their names could
8    not be connected to the deal.
9        Overt Act 47: On or about July 14, 2011, defendants
10   POSSINO, NIX, SCARPELLO, and SPITARI caused a Form 10-K for
11   Imobolis to be filed with the SEC, which falsely stated that
12   Imobolis had received $248,000 in revenue from the sale of banner
13   advertisements on the company's website.
14       Overt Act 48: On or about July 21, 2011, defendant
15   ANGELASTRI told defendants POSSINO, NIX, and MOYAL that they
16   needed to trade Imobolis stock "back and forth" for a couple of
17   days.  Defendant POSSINO replied that was okay, as long as it was
18   "us going back and forth with us."
19       Overt Act 49: On or about October 18, 2011, defendants
20   POSSINO and MENDIRATTA discussed that defendant POSSINO was
21   giving defendant MENDIRATTA an additional 8 million shares of
22   Imobolis for his role in the manipulation campaign.
23       Overt Act 50: On or about November 21, 2011, defendants
24   POSSINO, NIX, MENDIRATTA, ANGELASTRI, and SPITARI caused a
25   Schedule 14C Preliminary Information Statement to be filed with
26   the SEC notifying shareholders of Imobolis, among other things,
27   that the company's name was changed to "FrogAds, Inc.," and that
28   ///

                                27

defendant ANGELASTRI's wife was appointed as a director of the company.

Overt Act 51: On or about December 1, 2011, defendant ANGELASTRI cross traded approximately 10,000 shares of FrogAds from an account that he controlled at Zuercher Kantonalbank in Switzerland to another account that he controlled at UBS AG Zurich Investment Bank in Switzerland.

Overt Act 52: On or about December 8, 2011, defendant ANGELASTRI cross traded approximately 10,000 shares of FrogAds from an account that he controlled at Zuercher Kantonalbank in Switzerland to another account that he controlled at UBS AG Zurich Investment Bank in Switzerland.

Overt Act 53: On or about December 8, 2011, in planning the manipulation campaign for FrogAds, defendant MENDIRATTA told Person A that defendant MENDIRATTA was paying a promotion group approximately $200,000 per week to promote FrogAds stock.

Overt Act 54: On or about December 19, 2011, defendants POSSINO, NIX, MENDIRATTA, ANGELASTRI, and SPITARI caused the dissemination of a press release that falsely claimed that FrogAds was one of the Internet's "most visited websites."

Overt Act 55: On or about January 9, 2012, defendants POSSINO and NIX caused a stock analyst to issue a report recommending FrogAds as an attractive investment, with a price target for the company's stock that was approximately 500 percent higher than its then-current market price.

Overt Act 56: On or about January 19, 2012, defendant SPITARI caused the dissemination of a press release announcing

///

"FROGADS, INC. OPENS EAST COAST OFFICE TO SUPPORT EXPANDING LEADERSHIP POSITION IN U.S. INTERNET ADVERTISING MARKET."

Overt Act 57: On or about January 24, 2012, defendants POSSINO, NIX, MENDIRATTA, ANGELASTRI, and SPITARI caused a wire transfer of approximately $14,888 from an account in the name of Imobolis to a third party promotion group for the purpose of promoting FrogAds stock.

Overt Act 58: On or about January 31, 2012, defendants MENDIRATTA, ANGELASTRI, and SPITARI caused a payment of approximately $70,000 from an account in the name of Imobolis to defendant DAVIS's company, Scripted Consulting, as part of the manipulation campaign for FrogAds.

Overt Act 59: On or about February 2, 2012, defendant DAVIS sent an email soliciting a well known former professional athlete ("Athlete A") to become the celebrity spokesperson for FrogAds.

Overt Act 60: On or about February 10, 2012, defendant DAVIS sent an email to defendants MENDIRATTA and SPITARI regarding a draft press release announcing that a well known actress ("Actress A") had been retained as the celebrity spokeswoman for FrogAds.

Overt Act 61: On or about February 14, 2012, defendants MENDIRATTA, SPITARI, and DAVIS caused the dissemination of a press release announcing that Actress A was the new "Celebrity Spokesperson" for FrogAds.

Overt Act 62: On or about March 23, 2012, defendants MENDIRATTA, ANGELASTRI, and SPITARI caused a transfer of approximately $50,000 from an account in the name of Imobolis to

1  Scripted Consulting, as part of the FrogAds manipulation

2  campaign.

3        <u>Overt Act 63</u>: On or about March 23, 2012, defendant

4  MENDIRATTA told Person A details regarding the manipulation

5  campaign for FrogAds, including that defendant MENDIRATTA planned

6  to have Actress A be interviewed on the television program

7  "Squawk Box" to promote FrogAds.

8        <u>Overt Act 64</u>: On or about March 19, 2012, defendant

9  SPITARI and Unindicted Co-Conspirator 2 were interviewed by

10 FINRA's Office of Fraud Detection and Market Intelligence.

11 During this interview, defendant SPITARI falsely stated that (a)

12 he had not spoken with defendant NIX for "about a year and a

13 half," and (b) that he was unsure whether he knew defendant

14 POSSINO.

15       <u>Overt Act 65</u>: On or about March 22, 2012, defendant

16 SPITARI held a press conference with Actress A to announce her as

17 the new celebrity spokeswoman for FrogAds.

18       <u>Overt Act 66</u>: On or about March 26, 2012, defendants

19 POSSINO, NIX, MENDIRATTA, ANGELASTRI, SPITARI, and DAVIS caused

20 an infomercial, featuring Actress A as the FrogAds celebrity

21 spokeswoman and touting FrogAds stock, to be disseminated to the

22 public on YouTube.com.

23       <u>Overt Act 67</u>: On or about March 26, 2012, defendant

24 ANGELASTRI sold and caused the sale of approximately 1,207,500

25 shares of FrogAds from an account that he controlled at UBS AG

26 Zurich Investment Bank in Switzerland.

27       <u>Overt Act 68</u>: On or about April 24, 2012, defendant

28 MENDIRATTA told Person A details regarding the manipulation

1 | campaign for FrogAds, including that defendant MENDIRATTA had

2 | made a total of approximately $6.4 million from selling FrogAds

3 | stock, and that he had spent approximately $4 million to fund the

4 | manipulation campaign for FrogAds.

5 |      Overt Act 69: On or about April 25, 2012, defendant

6 | ANGELASTRI sold and caused the sale of approximately 1,438,917

7 | shares of FrogAds from an account that defendant ANGELASTRI

8 | controlled at UBS AG Zurich Investment Bank in Switzerland.

9 |      Overt Act 70: Between on or about May 3, 2012, and on

10 | or about May 31, 2012, defendant MENDIRATTA, using brokerage

11 | accounts in his own name, sold approximately 3,155,931 shares of

12 | FrogAds.

13 |      Overt Act 71: On or about June 11, 2012, defendant

14 | MENDIRATTA told Person A details regarding the manipulation

15 | campaign for FrogAds, including that (a) defendant MENDIRATTA

16 | planned to increase the number of authorized shares in FrogAds;

17 | and (b) the celebrity spokeswoman for FrogAds was gone and that

18 | the company was "a piece of shit now."

19 |      Overt Act 72: On or about September 14, 2012, defendant

20 | ANGELASTRI informed defendant MENDIRATTA in an email that

21 | defendant ANGELASTRI had sold approximately 10 million shares of

22 | FrogAds.

23 |     3.   Overt Acts Regarding Empire

24 |      Overt Act 73: On or about April 28, 2011, defendant

25 | POSSINO offered defendant HARRIS an opportunity to participate in

26 | the Empire manipulation campaign, telling defendant HARRIS that

27 | (a) defendant POSSINO and other conspirators had all of Empire's

28 | ///

31

1  stock; and (b) if necessary, the conspirators could change the
2  company's name as part of the campaign.

3      Overt Act 74: On or about June 16, 2011, defendant
4  POSSINO explained to defendant DUNN and Unindicted Co-
5  Conspirator 2 how participants in the Empire manipulation
6  campaign would accumulate, hold, and then sell Empire stock,
7  including that none of the participants would hold more than a
8  certain percentage of Empire's outstanding stock in his own name,
9  or through a single nominee, at any one time.

10     Overt Act 75: On or about June 27, 2011, defendant
11  MENDIRATTA told defendants POSSINO and NIX that he was very
12  interested in participating in the Empire manipulation campaign.

13     Overt Act 76: On or about June 30, 2011, defendant
14  MENDIRATTA suggested to defendant NIX that defendant ANGELASTRI
15  sell all of the participants' Empire stock during the Empire
16  manipulation campaign and distribute the resulting proceeds, and
17  defendant NIX replied that he had "no problem with that."

18     Overt Act 77: On or about July 1, 2011, defendant NIX
19  told defendant MOYAL that, as part of the Empire manipulation
20  campaign: (a) defendant NIX would obtain 48 million Empire
21  shares; (b) defendant NIX would give 24 million Empire shares to
22  the "guy who's doing the IR [investor relations]" for the
23  campaign; and (c) the remaining 24 million Empire shares would be
24  split three ways among defendants NIX, POSSINO, and MENDIRATTA.

25     Overt Act 78: On or about July 14, 2011, defendant DUNN
26  told defendant NIX that defendant DUNN was "willing to tell
27  [defendant NIX] face-to-face all the things you need to know
28  ///

[about Empire] ... but I can't put it on paper ... and you can't write it down."

Overt Act 79: On or about July 14, 2011, defendant NIX informed defendant ANGELASTRI that Empire had forty press releases ready to be released during the upcoming Empire manipulation campaign.

Overt Act 80: On or about August 3, 2011, defendant POSSINO informed defendant MENDIRATTA that (a) the Empire manipulation campaign was projected to begin on August 22, 2011; and (b) the conspirators needed to make Empire's stock DWAC-eligible.

Overt Act 81: On or about August 5, 2011, defendant NIX informed defendants POSSINO and MENDIRATTA that (a) defendant MACKEY would coordinate the promotion campaign for Empire; and (b) defendant MACKEY and his group of promoters had "clocked 35 million" for a recent campaign for a different company's stock. In response, defendant MENDIRATTA agreed that defendant MACKEY was "the real deal."

Overt Act 82: On or about August 15, 2011, defendant POSSINO told defendant DUNN that (a) Empire shares had been transferred to the DTC that day; (b) the conspirators could start trading Empire stock; and (c) a certain amount of trading was necessary before Empire could gain DWAC approval.

Overt Act 83: On or about August 16, 2011, defendant POSSINO told defendant MENDIRATTA during a telephone call that there were 48 million free trading shares of Empire and "we got em all." When defendant MENDIRATTA asked defendant POSSINO to confirm that the stock was entirely owned by defendants POSSINO,

1  NIX, and MENDIRATTA, defendant POSSINO responded, "listen, I

2  don't feel comfortable talking too much about this -- you know,

3  we can talk another time, this is ... like, a landline."

4       Overt Act 84: On or about August 16, 2011, defendant

5  POSSINO told defendant MENDIRATTA that, in preparation to reapply

6  for Empire's stock to become DWAC-eligible, the conspirators

7  would have to cross trade about $50,000 worth of trades in Empire

8  stock "back and forth."

9       Overt Act 85: On or about August 17, 2011, defendant

10  NIX told defendant ANGELASTRI that 28,000 shares of Empire had

11  traded that day, and defendants NIX and ANGELASTRI agreed that

12  they would cause the same volume of trading in Empire's stock the

13  following day.

14       Overt Act 86: On or about August 19, 2011, defendant

15  POSSINO told defendant MENDIRATTA that he did not understand why

16  Empire's stock had not been granted DWAC-eligibility, given that

17  the conspirators had created the appearance that Empire had

18  "revenues ... volume ... trade ... market makers ... everything."

19  Defendant POSSINO suggested that it was possible that Empire's

20  application had been denied [by the DTC] because defendants

21  POSSINO and MENDIRATTA were involved in the deal, to which

22  defendant MENDIRATTA replied, "you and I involved is not a good

23  thing."

24       Overt Act 87: On or about August 25, 2011, defendant

25  NIX told defendant POSSINO that the promotion group represented

26  by defendant MACKEY was "ready to go immediately" and that

27  defendants NIX and POSSINO would have to send Empire shares to

28  the stock transfer agent.

34

1    **Overt Act 88**: On or about September 7, 2011, defendant
2    MENDIRATTA told defendant NIX that it would be "great" to be able
3    to sell Empire stock at 40 cents per share during the
4    manipulation campaign, because selling at that price would yield
5    almost $2 million in proceeds for defendant MENDIRATTA.

6    **Overt Act 89**: On or about September 13, 2011, defendant
7    NIX informed defendant HARRIS that (a) during a conference call
8    that day with defendants NIX and DUNN and others, a stock
9    research analyst had been "very impressed" with Empire's numbers;
10   and (b) defendant NIX wanted "to make sure everyone is on the
11   same page, you know, we're gonna let this thing, you know, go up
12   and not just, you know, blow this shit out at 25 cents." In
13   response, defendant HARRIS told defendant NIX that (a) defendant
14   HARRIS was communicating with defendant MACKEY several times a
15   day; and (b) defendants HARRIS, NIX, and MACKEY would get on a
16   conference call before the end of the week to make sure that
17   everyone was on the same page.

18   **Overt Act 90**: On or about September 15, 2011, defendant
19   DUNN told defendant POSSINO that it was "important" that
20   defendant POSSINO sell defendant DUNN's "million shares" of
21   Empire stock.

22   **Overt Act 91**: On or about September 20, 2011, defendant
23   NIX told defendant ANGELASTRI that Empire's opening price at the
24   start of the manipulation campaign would be 20 to 25 cents per
25   share, and that the promotion group thought they could "take it
26   to north of 70 ... maybe even a buck." Defendant ANGELASTRI
27   replied that an average price of 40 cents per share would be
28   ///

1  about $20 million in proceeds, and that "our part would be 30

2  percent, six million."

3       Overt Act 92: On or about September 30, 2011, defendant

4  HARRIS told defendant POSSINO that defendant HARRIS (a) had made

5  a commitment to participate in the Empire manipulation

6  campaign; (b) was "focused on [Empire] as the only priority"; and

7  (c) wanted to "make sure we hit a home run."

8       Overt Act 93: On or about November 17, 2011, defendant

9  MACKEY told defendants DUNN, POSSINO, and NIX that (a) some of

10 the promoters in the Empire manipulation campaign were "the very

11 best people in the industry," and (b) defendant MACKEY was a

12 member of an investor relations group that disseminated

13 information and handled advertising, marketing, and attracting

14 new shareholders.

15      Overt Act 94: On or about December 12, 2011, defendant

16 POSSINO sent an email to defendant NIX, including an attachment

17 entitled "PR HEADLINES FOR EMPM.doc," which laid out a schedule

18 for issuing twenty-five press releases regarding Empire during

19 the manipulation campaign.

20      Overt Act 95: On or about December 21, 2011, defendant

21 DUNN emailed defendants POSSINO and NIX to express concern that a

22 certain brokerage firm had stopped trading in a certain stock,

23 and asked them, "[i]s this a problem that we might face with BDP

24 [referring to "Best Damn Penny," a stock promotion group]?"

25      Overt Act 96: On or about December 24, 2011, defendant

26 DUNN emailed defendant POSSINO, setting forth "several scenarios"

27 for selling approximately 48 million Empire shares at various

28 average per-share sale prices during the manipulation campaign.

1             Overt Act 97: On or about January 25, 2012, defendants

2 DUNN and POSSINO caused Empire to issue a press release entitled

3 "EMPIRE POST MEDIA LAUNCHES 3D CONTENT DEVELOPMENT PROGRAM FUND."

4             Overt Act 98: On or about March 26, 2012, defendants

5 POSSINO and NIX, using a brokerage account in the name of

6 Calbridge Capital, sold approximately 510,000 shares of Empire.

7             Overt Act 99: On or about April 1, 2012, defendants

8 DUNN, POSSINO, and NIX caused Empire to issue a press release

9 entitled "EMPIRE POST MEDIA, INC. ADDRESS STOCK VOLUME AND PRICE

10 ACTIVITY," which falsely stated: (a) "no [investor] awareness

11 program has been initiated and/or paid for by the officers,

12 directors, affiliates or employees of [Empire]"; and (b) "no

13 shares held by current [Empire] officers, directors, affiliates

14 or employees are being sold into the market as all of their

15 shares are restricted from trading under applicable federal

16 securities laws."

17             Overt Act 100: On or about May 23, 2012, defendants

18 POSSINO and NIX, using a brokerage account in the name of

19 Calbridge Capital, sold approximately 826,500 shares of Empire.

20       4.     Additional Overt Acts Regarding the Scheme to
Manipulate the Stocks of Public Companies

21

22             Overt Act 101: On or about April 28, 2011, in

discussing the need to conceal the conspirators' identities and

23

involvement in the manipulation campaigns, defendant HARRIS told

24

defendant POSSINO that (a) "[W]e all have some dirty laundry, but

25

let's take it off the fucking window sill"; (b) the conspirators

26

could do business with "the fucking Queen of England, you know,

27

as long as you didn't have that email address [for Calbridge

28

37

Capital] and money being sent to Wellington Manor"; (c) defendant HARRIS could set up a new corporation and email address that had no apparent connection to defendant POSSINO; and (d) "we just have to hide ourselves better."

Overt Act 102: On or about May 12, 2011, after defendant SCARPELLO suggested that defendants POSSINO and NIX replace the nominee that they had been using for Calbridge Capital with a different nominee whom they had used as a shareholder on a previous deal, defendant POSSINO responded that many of the shareholders "are Fugazi" (i.e., fake) and "I can just pull them out of my ass."

Overt Act 103: On or about June 27, 2011, in discussing that Wellington Manor had been connected to defendant POSSINO and Calbridge Capital on the Internet, defendant NIX told defendant POSSINO, "we need new bodies" (i.e., nominees) for Wellington Manor and Trilogy Expedition, and defendant POSSINO agreed, responding "we need new bodies for sure."

Overt Act 104: On or about July 6, 2011, defendant MENDIRATTA told defendant NIX: (a) "the feds are following me"; and (b) "the only reason you're driving a fucking $250,000 car and living in a $10 million house is because you never got caught." Defendant NIX agreed, stating "fair enough."

Overt Act 105: On or about July 26, 2011, defendants POSSINO, NIX, and MENDIRATTA discussed six manipulation campaigns that they were planning to do before the end of 2011, including campaigns for Imobolis, Empire, a company known as "Zevotek," and a company with the stock symbol "TAEC," as well as two additional deals.

1    Overt Act 106: On or about September 1, 2011, in
2  discussing the need to conceal the conspirators' activities,
3  defendant POSSINO told defendant NIX that defendant POSSINO had
4  told a third party (whom the conspirators wanted to participate
5  in those activities) that "in my office we have a very strict
6  policy: number one, no interviews, no reporters ... and no
7  statements to the police."  Defendant POSSINO stated that this
8  policy was what "keeps everybody out of jail [because] most
9  people end up putting nails in their own coffin."

10    Overt Act 107: On or about September 7, 2011, defendant
11  MENDIRATTA told defendant POSSINO that he thought all the
12  proceeds from a particular manipulation campaign should go to
13  defendant ANGELASTRI in Switzerland, who would then distribute
14  the profits.  Defendant POSSINO responded that he preferred to
15  send the proceeds to several different nominees to better avoid
16  detection, stating "instead of them sending one big piece over
17  to, let's say, your friend over there, why don't we give them,
18  say, 20 or 30 different things ...  Like send 50 here, 20 there,
19  20 here, 40 there.  You know, in other words, spread [the money]
20  around, so that ... following the money is not so easy."

21    Overt Act 108: On or about September 7, 2011, in
22  further discussing how to distribute the proceeds of their market
23  manipulation scheme, defendant POSSINO told defendant MENDIRATTA
24  that "if anything blows up, it's not going to just be a blow-up,
25  it's going to be, like, atomic."  As a result, defendant POSSINO
26  suggested that they spread the proceeds around to several
27  nominees to make them more difficult to follow, explaining "send
28  it out to say 20 or 30 different boxes that all go in different

                                39

1  places and there's no common interest. ... Instead of following
2  the money down to the hole in the ground over here, let's dig up
3  the hole, it's like, 'what the fuck?  Where are all these holes
4  coming from?'"  Defendant MENDIRATTA responded that they were
5  better off having the proceeds overseas, stating "the point is,
6  if it does blow up, it goes to one place - it's over there.  You
7  understand what I'm saying?"

8      Overt Act 109: On or about October 6, 2011, defendant
9  MENDIRATTA told defendant POSSINO that defendant POSSINO needed
10  to tell defendant NIX that "when a fucking FBI agent pulls up to
11  tell you to rat on your client or take time, you take time and
12  man up."  Defendant POSSINO responded, "that's what I did."

13      Overt Act 110: On or about October 6, 2011, defendant
14  MENDIRATTA told defendant POSSINO that he had grossed
15  between $75 million and $80 million since 2002.

16      Overt Act 111: On or about November 15, 2011, in order
17  to persuade a third party to assist a manipulation campaign,
18  defendant POSSINO advised that third party that "news and
19  revenues" (i.e., press releases from a company and reported
20  revenues for the company) were essential to generating a high
21  return from a manipulation campaign because investors were
22  becoming better at detecting when a company had "nothing behind
23  it."

24      Overt Act 112: On or about December 5, 2011, in order
25  to persuade Person A to assist a manipulation campaign, defendant
26  NIX told Person A that (a) he had bought his house with "Dhanoa"
27  (i.e., he had been able to purchase a house with the proceeds of
28  a manipulation campaign for a company with that name); (b) in six

weeks, the conspirators had taken in $10 million from that campaign; and (c) the conspirators had taken in "another 10" (i.e., $10 million) for a separate campaign for a company known as "Matech."

Overt Act 113: On or about December 13, 2011, to persuade Person A to participate in the manipulation conspiracy, defendant MENDIRATTA told Person A that his plan was to make $250 million over the next three years and then quit.

COUNT TWO

[Defendants POSSINO, NIX, MENDIRATTA, ANGELASTRI, HARRIS, MOYAL, and SCARPELLO]

[18 U.S.C. §§ 1348(1), 2]

[Securities Fraud]

21.   The Grand Jury hereby realleges and incorporates by reference paragraphs 1 through 10 and 14 through 20 of this Indictment as though fully set forth herein.

22.   Beginning no later than in or about August 2009, and continuing through at least in or about December 2010, in Los Angeles County, within the Central District of California, and elsewhere, defendants POSSINO, NIX, MENDIRATTA, ANGELASTRI, HARRIS, MOYAL, and SCARPELLO, together with others known and unknown to the Grand Jury, knowingly and with intent to defraud, executed, attempted to execute, aided and abetted the execution of, willfully caused to be executed, and participated in a scheme and artifice to defraud investors as to material matters and in connection with securities of Sport Endurance, an issuer with securities registered under section 12 of the Securities Exchange Act of 1934 and which was required to file reports under Section 15(d) of the Securities Exchange Act of 1934.

23.   The fraudulent scheme operated and was executed, in substance, as set forth in paragraphs 14 through 19 and Overt Acts 1 through 30 of this Indictment.

42

COUNT THREE

[Defendants POSSINO, NIX, MENDIRATTA, ANGELASTRI, HARRIS, MOYAL, SCARPELLO, SPITARI, and DAVIS]

[18 U.S.C. §§ 1348(1), 2]

[Securities Fraud]

24.   The Grand Jury hereby realleges and incorporates by reference paragraphs 1 through 10 and 14 through 20 of this Indictment as though fully set forth herein.

25.   Beginning no later than in or about March 2010, and continuing through at least in or about October 2012, in Los Angeles County, within the Central District of California, and elsewhere, defendants POSSINO, NIX, MENDIRATTA, ANGELASTRI, MARK HARRIS, MOYAL, SCARPELLO, SPITARI, and DAVIS, together with others known and unknown to the Grand Jury, knowingly and with intent to defraud, executed, attempted to execute, aided and abetted the execution of, willfully caused to be executed, and participated in a scheme and artifice to defraud investors as to material matters and in connection with securities of FrogAds, an issuer with securities registered under section 12 of the Securities Exchange Act of 1934 and which was required to file reports under Section 15(d) of the Securities Exchange Act of 1934.

26.   The fraudulent scheme operated and was executed, in substance, as set forth in paragraphs 14 through 19 and Overt Acts 31 through 72 of this Indictment.

43

COUNT FOUR

[Defendants POSSINO, NIX, MENDIRATTA, ANGELASTRI, HARRIS, MOYAL, DUNN, and MACKEY]

[18 U.S.C. §§ 1348(1), 2]

[Securities Fraud]

27.  The Grand Jury hereby realleges and incorporates by reference paragraphs 1 through 10 and 14 through 20 of this Indictment as though fully set forth herein.

28.  Beginning no later than in or about April 2011, and continuing through at least in or about October 2012, in Los Angeles County, within the Central District of California, and elsewhere, defendants POSSINO, NIX, MENDIRATTA, ANGELASTRI, HARRIS, MOYAL, DUNN, and MACKEY, together with others known and unknown to the Grand Jury, knowingly and with intent to defraud, executed, attempted to execute, aided and abetted the execution of, willfully caused to be executed, and participated in a scheme and artifice to defraud investors as to material matters and in connection with securities of Empire, an issuer with securities registered under section 12 of the Securities Exchange Act of 1934 and which was required to file reports under Section 15(d) of the Securities Exchange Act of 1934.

29.  The fraudulent scheme operated and was executed, in substance, as set forth in paragraphs 14 through 19 and Overt Acts 73 through 100 of this Indictment.

44

COUNTS FIVE THROUGH SIXTEEN

[Defendants POSSINO, NIX, MENDIRATTA, ANGELASTRI, HARRIS, MOYAL, SCARPELLO, SPITARI, DUNN, and MACKEY]

[15 U.S.C. §§ 78j(b), 78ff; 17 C.F.R. § 240.10b-5; 18 U.S.C. § 2]

[Securities Fraud]

30.    The Grand Jury hereby realleges and incorporates by reference paragraphs 1 through 10 and 14 through 20 of this Indictment as though fully set forth herein.

31.    Between in or about June 2009, and continuing through in or about December 2012, in Los Angeles and Orange Counties, within the Central District of California, and elsewhere, defendants POSSINO, NIX, MENDIRATTA, ANGELASTRI, HARRIS, MOYAL, SCARPELLO, SPITARI, DUNN, and MACKEY, together with others known and unknown to the Grand Jury, knowingly and willfully, directly and indirectly, used and employed manipulative and deceptive devices and contrivances in connection with the purchase and sale of securities of several companies, including, but not limited to, Sport Endurance, FrogAds, and Empire, by (1) employing a scheme to defraud; (2) making untrue statements of material fact and omitting to state material facts necessary to make the statements made, in light of the circumstances in which they were made, not misleading; and (3) engaging in acts, practices, and courses of business that operated as a fraud and deceit.

32.    The manipulative and deceptive devices operated, in substance, as set forth in paragraphs 14 through 20 of this Indictment.

33.    On or about the following dates, within the Central District of California, and elsewhere, defendants POSSINO, NIX,

MENDIRATTA, ANGELASTRI, HARRIS, MOYAL, SCARPELLO, SPITARI, DUNN, and MACKEY, in furtherance of the manipulative and deceptive devices described above, directly and indirectly used and willfully caused to be used the means and instrumentalities of interstate commerce, the mails, and the facilities of a national securities exchange in connection with the purchases and sales of the following securities:

| COUNT | DEFENDANTS | DATE | TRANSACTION |
|-------|-----------|------|-------------|
| FIVE | POSSINO NIX MENDIRATTA ANGELASTRI SCARPELLO | 8/12/2010 | Sale of 26,000 shares of Sport Endurance in account no. xxxx6805 held by defendant SCARPELLO at Newport Coast Securities |
| SIX | POSSINO NIX MENDIRATTA ANGELASTRI SCARPELLO | 8/12/2010 | Sale of 250,000 shares of Sport Endurance in account no. xxxxxx1712 held by October Funds at BMA Securities |
| SEVEN | POSSINO NIX MENDIRATTA ANGELASTRI HARRIS SCARPELLO | 10/29/2010 | Sale of 1,250,000 shares of Sport Endurance in account xxxx5185 held by Trilogy Expedition at Newport Coast Securities |
| EIGHT | POSSINO NIX MENDIRATTA ANGELASTRI HARRIS SCARPELLO | 11/2/2010 | Sale of 2,000,000 shares of Sport Endurance in account no. xxxx5193 held by SLC Air at Newport Coast Securities |

| COUNT | DEFENDANTS | DATE | TRANSACTION |
|---|---|---|---|
| NINE | POSSINO NIX MENDIRATTA ANGELASTRI HARRIS MOYAL SCARPELLO SPITARI | 4/12/2011 | Sale of 400,000 shares of Imobolis from defendant SPITARI to Ebony Finance |
| TEN | POSSINO NIX MENDIRATTA ANGELASTRI HARRIS MOYAL SCARPELLO SPITARI | 4/12/2011 | Sale of 400,000 shares of Imobolis from defendant SPITARI to Serendipity |
| ELEVEN | POSSINO NIX MENDIRATTA ANGELASTRI HARRIS MOYAL SCARPELLO SPITARI | 4/12/2011 | Sale of 400,000 shares of Imobolis from defendant SPITARI to Steinhov |
| TWELVE | POSSINO NIX MENDIRATTA ANGELASTRI HARRIS MOYAL DUNN MACKEY | 8/17/2011 | Sale of 18,000 shares of Empire in account xxxx9445 held by Calbridge Capital at Legend Securities |

47

| COUNT | DEFENDANTS | DATE | TRANSACTION |
|---|---|---|---|
| THIRTEEN | POSSINO<br>NIX<br>MENDIRATTA<br>ANGELASTRI<br>HARRIS<br>MOYAL<br>DUNN<br>MACKEY | 8/18/2011 | Sale of 22,000 shares of Empire in account xxxx9445 held by Calbridge Capital at Legend Securities |
| FOURTEEN | POSSINO<br>NIX<br>MENDIRATTA<br>ANGELASTRI<br>HARRIS<br>MOYAL<br>SCARPELLO<br>SPITARI | 9/16/2011 | Sale of 500 shares of FrogAds in account no. xxxx7283 held by Taylor Financial at Spartan Securities Group |
| FIFTEEN | POSSINO<br>NIX<br>MENDIRATTA<br>ANGELASTRI<br>HARRIS<br>MOYAL<br>DUNN | 3/26/2012 | Sale of 500,000 shares of Empire in account xxxx5395 held by Calbridge Capital at Legend Securities |
| SIXTEEN | POSSINO<br>NIX<br>MENDIRATTA<br>ANGELASTRI<br>HARRIS<br>MOYAL<br>DUNN | 5/23/2012 | Sale of 826,500 shares of Empire in account xxxx5395 held by Calbridge Capital at Legend Securities |

48

COUNTS SEVENTEEN THROUGH TWENTY-TWO

[Defendants POSSINO, NIX, MENDIRATTA, ANGELASTRI, HARRIS, MOYAL,
SCARPELLO, SPITARI, DUNN, MACKEY, and DAVIS]

[18 U.S.C. §§ 1343, 2]

[Wire Fraud]

34.   The Grand Jury hereby realleges and incorporates by
reference paragraphs 1 through 10 and 14 through 20 of this
Indictment as though fully set forth herein.

A.   THE SCHEME TO DEFRAUD

35.   Beginning no later than in or about June 2009, and
continuing through at least in or about December 2012, in Los
Angeles County, within the Central District of California, and
elsewhere, defendants POSSINO, NIX, MENDIRATTA, ANGELASTRI,
HARRIS, MOYAL, SCARPELLO, SPITARI, DUNN, MACKEY, and DAVIS,
together with others known and unknown to the Grand Jury,
knowingly and with intent to defraud, devised, participated in,
and executed a scheme to defraud investor victims as to material
matters, and to obtain money and property from investor victims
by means of material false and fraudulent pretenses,
representations, and promises, and the concealment of material
facts.

36.   The fraudulent scheme operated, in substance, as set
forth in paragraphs 14 through 20 of this Indictment.

B.   USE OF THE WIRES

37.   On or about the following dates, within the Central
District of California, and elsewhere, the following defendants,
for the purpose of executing the above-described scheme to
defraud, transmitted, caused the transmission of, and aided and

49

abetted the transmission of the following items by means of wire and radio communication in interstate and foreign commerce:

| COUNT | DEFENDANTS | DATE | ITEM WIRED |
|-------|-----------|------|-----------|
| SEVENTEEN | POSSINO NIX SCARPELLO | 4/19/2010 | Wire transfer, via the Federal Reserve Bank's Fedwire system in New Jersey, of approximately $1,500 from account no. XXXXXX5539 in the name of Calbridge Capital at JPMorgan Chase Bank in the Central District of California to an account in the name of Kinchen & Associates at Bank of America in Texas |
| EIGHTEEN | POSSINO NIX MENDIRATTA ANGELASTRI SCARPELLO | 9/2/2010 | Telephone call between defendants POSSINO and NIX in the Central District of California and defendant ANGELASTRI in Switzerland |
| NINETEEN | POSSINO NIX MENDIRATTA ANGELASTRI HARRIS MOYAL SCARPELLO SPITARI | 6/8/2011 | Telephone call between defendant MENDIRATTA in Connecticut and defendants POSSINO and NIX in the Central District of California |
| TWENTY | POSSINO NIX MENDIRATTA ANGELASTRI HARRIS MOYAL SCARPELLO SPITARI DAVIS | 2/14/2012 | Wire transfer, via the Federal Reserve Bank's Fedwire system in New Jersey, of approximately $82,500 from account no. XXXXX7563 in the name of FrogAds at JPMorgan Chase Bank in California to Actress A at City National Bank in the Central District of California |

50

| COUNT | DEFENDANTS | DATE | ITEM WIRED |
|-------|-----------|------|-----------|
| TWENTY-ONE | POSSINO NIX MENDIRATTA ANGELASTRI HARRIS DUNN MACKEY | 11/17/2011 | Telephone call between defendants POSSINO, NIX, and DUNN in the Central District of California and defendant MACKEY in Florida |
| TWENTY-TWO | POSSINO NIX MENDIRATTA ANGELASTRI HARRIS MOYAL DUNN MACKEY | 1/9/2012 | Wire transfer, via the Federal Reserve Bank's Fedwire system in New Jersey, of approximately $9,975 from account no. xxxxxx3557 in the name of 8 Sounds at Bank of America in California to account no. xxxxxx6956 in the name of Calbridge Capital at Wells Fargo Bank in the Central District of California |

COUNTS TWENTY-THREE THROUGH TWENTY-FIVE

[Defendants POSSINO, NIX, MENDIRATTA, ANGELASTRI, HARRIS, MOYAL, SCARPELLO, and SPITARI]

[18 U.S.C. §§ 1350, 2]

[Willful Certification of a False Financial Report]

38.    The Grand Jury hereby realleges and incorporates by reference paragraphs 1 through 10 and 14 through 20 of this Indictment as though fully set forth herein.

39.    On or about the following dates, in Los Angeles County, within the Central District of California, and elsewhere, defendant SPITARI, aided and abetted by defendants POSSINO, NIX, MENDIRATTA, ANGELASTRI, HARRIS, MOYAL, and SCARPELLO, in the following written periodic reports that Imobolis and FrogAds filed with the SEC pursuant to Sections 13(a) and 15(d) of the Securities Exchange Act of 1934, willfully and knowingly certified, and caused to be certified, that the financial statements in those periodic reports fairly presented, in all material respects, the company's financial condition and the results of its operations, knowing that those periodic filings did not fairly present, in all material respects, the company's financial condition and the results of its operations:

| COUNT | DATE | CERTIFICATION |
|---|---|---|
| TWENTY-THREE | 7/14/2011 | Certification of Imobolis' Form 10-K Annual Report for the fiscal year ended March 31, 2011 (the "2011 Form 10-K"), filed on July 14, 2011 |
| TWENTY-FOUR | 2/21/2012 | Certification of FrogAds' Form 10-Q Quarterly Report for the fiscal quarter ended December 31, 2011 (the "February 2012 Form 10-Q"), filed on February 21, 2012 |

52

| COUNT | DATE | CERTIFICATION |
|---|---|---|
| TWENTY-FIVE | 7/18/2012 | Certification of Frogads' Form 10-K Annual Report for the Fiscal Year ended March 31, 2012 (the "2012 Form 10-K"), filed on July 18, 2012 |

40.   Specifically, in the 2011 Form 10-K, the February 2012 Form 10-Q, and the 2012 Form 10-K, the company reported that it had earned $248,000 in revenues between November 26, 2010 and March 31, 2011 from the sale of banner advertisements on its website.   As defendants POSSINO, NIX, MENDIRATTA, ANGELASTRI, HARRIS, MOYAL, SCARPELLO, and SPITARI then well knew, those statements did not fairly present the company's financial condition and the results of its operations, but were instead materially false and misleading, because the $248,000 reported as revenue in the company's 2011 Form 10-K, the February 2012 Form 10-Q, and the 2012 Form 10-K:

a.    Did not come from the sale of banner advertisements on Imobolis' website;

b.    Was instead funds that defendant ANGELASTRI transferred to Imobolis, in part, to buy Imobolis shares as part of the manipulation campaign; and

c.    Materially overstated the company's actual revenue for the fiscal year ending March 31, 2011.

53

COUNT TWENTY-SIX

[Defendants POSSINO, NIX, MENDIRATTA, ANGELASTRI, HARRIS, MOYAL, SCARPELLO, and SPITARI]

[18 U.S.C. § 1956(h)]

[Money Laundering Conspiracy]

41.   The Grand Jury hereby realleges and incorporates by reference paragraphs 1 through 10, 14 through 20, 22, 25, 28, 31 through 33, and 35 through 37 of this Indictment as though fully set forth herein.

42.   As used in this Count Twenty-Six, the term "Specified Unlawful Activity" means:

   a.   Securities fraud, in violation of Title 18, United States Code, Section 1348(1);

   b.   Securities fraud, in violation of Title 15, United States Code, Sections 78j(b) and 78ff(a), and Title 17, Code of Federal Regulations, Section 240.10b-5; and

   c.   Wire fraud, in violation of Title 18, United States Code, Section 1343.

A.   THE OBJECT OF THE CONSPIRACY

43.   Beginning no later than in or about June 2009, and continuing through at least in or about December 2012, in Los Angeles County, within the Central District of California, and elsewhere, defendants POSSINO, NIX, MENDIRATTA, ANGELASTRI, HARRIS, MOYAL, SCARPELLO, and SPITARI, together with others known and unknown to the Grand Jury, knowingly combined, conspired, and agreed to commit international promotional money laundering, in violation of Title 18, United States Code, Section 1956(a)(2)(A), by transporting, transmitting, and transferring, and attempting

54

1  to transport, transmit, and transfer, monetary instruments and

2  funds to places inside the United States from and through places

3  outside the United States, with the intent to promote the

4  carrying on of Specified Unlawful Activity.

5  B.   THE MANNER AND MEANS OF THE CONSPIRACY

6       44.   The object of the conspiracy was carried out, and to be

7  carried out, in substance, as follows:

8            a.   In order to promote the carrying on of Specified

9  Unlawful Activity, among other purposes, defendants POSSINO, NIX,

10  MENDIRATTA, ANGELASTRI, HARRIS, MOYAL, and SCARPELLO, and others

11  known and unknown to the Grand Jury, caused monetary transfers

12  from accounts in Switzerland and Liechtenstein, including

13  accounts in the names of defendant ANGELASTRI, Ebony Finance,

14  Serendipity, Steinhov, and Sula, to accounts in the United

15  States, including accounts in the names of Calbridge Capital,

16  Apache Capital, and FrogAds.

17           b.   Defendants POSSINO, NIX, HARRIS, MOYAL, SCARPELLO,

18  and SPITARI, and others known and unknown to the Grand Jury, used

19  and caused to be used the monies received in the accounts in the

20  names of Calbridge Capital, Apache Capital, and FrogAds for

21  purposes of promoting the carrying on of Specified Unlawful

22  Activity, including promoting and purchasing the stocks of Sport

23  Endurance, FrogAds, and Empire in preparation for and during the

24  manipulation campaigns for those companies.

25  C.   OVERT ACTS

26       45.   The Grand Jury hereby realleges and incorporates by

27  reference Overt Acts 1 through 113 of Count One of this

28  Indictment as though fully set forth herein.

COUNTS TWENTY-SEVEN THROUGH THIRTY-THREE

[Defendants POSSINO, NIX, MENDIRATTA, ANGELASTRI, HARRIS, MOYAL, SCARPELLO, and SPITARI]

[18 U.S.C. §§ 1956(a)(2)(A), 2]

[International Promotional Money Laundering]

46.   The Grand Jury hereby realleges and incorporates by reference paragraphs 1 through 10, 14 through 20, 22, 25, 28, 31 through 33, 35 through 37, and 43 through 44 of this Indictment as though fully set forth herein.

47.   As used in these Counts Twenty-Seven through Thirty-Three, the term "Specified Unlawful Activity" means:

       a.   Securities fraud, in violation of Title 18, United States Code, Section 1348(1);

       b.   Securities fraud, in violation of Title 15, United States Code, Sections 78j(b) and 78ff(a), and Title 17, Code of Federal Regulations, Section 240.10b-5; and

       c.   Wire fraud, in violation of Title 18, United States Code, Section 1343.

48.   On or about the following dates, in Los Angeles County, within the Central District of California, and elsewhere, defendants POSSINO, NIX, MENDIRATTA, ANGELASTRI, HARRIS, MOYAL, SCARPELLO, and SPITARI, with the intent to promote the carrying on of Specified Unlawful Activity, transported, transmitted, and transferred, and attempted to transport, transmit, and transfer, the following monetary instruments and funds to a place inside the United States from and through a place outside the United States:

56

| COUNT | DEFENDANTS | DATE | MONETARY INSTRUMENT OR FUNDS |
|---|---|---|---|
| TWENTY-SEVEN | POSSINO NIX MENDIRATTA ANGELASTRI | 8/4/2010 | Transfer of approximately $4,981.29 from account xxx.149 in the name of Ebony Finance at Bank Frick in Liechtenstein to account xxxxx6831 at Wells Fargo Bank in the United States to promote the Sport Endurance manipulation campaign |
| TWENTY-EIGHT | POSSINO NIX MENDIRATTA ANGELASTRI HARRIS SCARPELLO | 10/14/2010 | Transfer of approximately $99,972.65 from account xxx.149 in the name of Ebony Finance at Bank Frick in Liechtenstein to account xxxxxx7378 in the name of Apache Capital at Wells Fargo Bank in the United States to promote the Sport Endurance manipulation campaign |
| TWENTY-NINE | POSSINO NIX MENDIRATTA ANGELASTRI MOYAL | 5/20/2011 | Transfer of approximately $87,492.04 from account xxx.155 in the name of Steinhov at Bank Frick in Liechtenstein to account xxxxxx5539 in the name of Calbridge Capital at JP Morgan Chase Bank in the United States to promote the FrogAds manipulation campaign |
| THIRTY | POSSINO NIX MENDIRATTA ANGELASTRI | 7/13/2011 | Transfer of approximately $19,991.49 from account xxx.154 in the name of Serendipity at Bank Frick in Liechtenstein to account xxxxxx5539 in the name of Calbridge Capital at JPMorgan Chase in the United States to promote the Empire manipulation campaign |

| COUNT | DEFENDANTS | DATE | MONETARY INSTRUMENT OR FUNDS |
|---|---|---|---|
| THIRTY-ONE | POSSINO NIX MENDIRATTA ANGELASTRI | 7/13/2011 | Transfer of approximately $19,991.58 from account xxx.155 in the name of Steinhov at Bank Frick in Liechtenstein to account xxxxxx5539 in the name of Calbridge Capital at JPMorgan Chase in the United States to promote the Empire manipulation campaign |
| THIRTY-TWO | POSSINO NIX MENDIRATTA ANGELASTRI SPITARI | 1/31/2012 | Transfer of approximately $75,000 from account xxxxxxxxxxxxxxxxxx7073 in the name of defendant ANGELASTRI at UBS AG Zurich Investment Bank in Switzerland to account xxxxx7563 in the name of FrogAds at JPMorgan Chase in the United States to promote the FrogAds manipulation campaign |
| THIRTY-THREE | POSSINO NIX MENDIRATTA ANGELASTRI SPITARI | 2/14/2012 | Transfer of approximately $79,992.50 from account xxxxxxxxxxxxxxxxxx2001 in the name of Sula at Basler Kantonalbank in Switzerland to account xxxxx7563 in the name of FrogAds at JPMorgan Chase in the United States to promote the FrogAds manipulation campaign |

COUNTS THIRTY-FOUR THROUGH THIRTY-SEVEN

[Defendants POSSINO and NIX]

[18 U.S.C. § 1956(a)(1)(B)(i)]

[Concealment Money Laundering]

49. The Grand Jury hereby realleges and incorporates by reference paragraphs 1 through 10, 14 through 20, 22, 25, 28, 31 through 33, 35 through 37, and 43 through 44 of this Indictment as though fully set forth herein.

50. As used in these Counts Thirty-Four through Thirty-Seven, the term "Specified Unlawful Activity" means:

a. Securities fraud, in violation of Title 18, United States Code, Section 1348(1);

b. Securities fraud, in violation of Title 15, United States Code, Sections 78j(b) and 78ff(a), and Title 17, Code of Federal Regulations, Section 240.10b-5; and

.c. Wire fraud, in violation of Title 18, United States Code, Section 1343.

51. On or about the following dates, in Los Angeles County, within the Central District of California, and elsewhere, defendants POSSINO and NIX conducted, attempted to conduct, aided and abetted the conducting of, and willfully caused others to conduct the following financial transactions affecting interstate and foreign commerce that in fact involved the proceeds of Specified Unlawful Activity, knowing that (a) the property involved in the following financial transactions represented the proceeds of some form of unlawful activity constituting a felony under state or federal law, and (b) the transactions were designed in whole and in part to conceal and disguise the nature,

59

location, source, ownership, and control of the proceeds of
Specified Unlawful Activity:

| COUNT | DEFENDANTS | DATE | FINANCIAL TRANSACTION |
|-------|-----------|------|----------------------|
| THIRTY-FOUR | POSSINO NIX | 11/9/2010 | Payment of check 1033 in the amount of approximately $2,691 drawn on JPMorgan Chase account xxxxxx5505 in the name of SLC Air to JPMorgan Chase account xxxxx2446 in the name of Black Napkin |
| THIRTY-FIVE | POSSINO NIX | 11/15/2010 | Payment of check 1031 in the amount of approximately $9,975 drawn on JPMorgan Chase account xxxxxx5505 in the name of SLC Air to US Bank account xxxxxxxx8804 in the name of Rancho Malibu |
| THIRTY-SIX | NIX | 5/30/2012 | Transfer of approximately $10,000 from US Bank account xxxxxxxx7951 in the name of Calbridge Capital to US Bank account xxxxxxxx7944 in the name of Black Napkin |
| THIRTY-SEVEN | NIX | 6/8/2012 | Transfer of approximately $20,000 from US Bank account xxxxxxxx7951 in the name of Calbridge Capital to US Bank account xxxxxxxx7944 in the name of Black Napkin |

ADDITIONAL SENTENCING ENHANCEMENTS

[Defendants MENDIRATTA, MOYAL, MACKEY, and DAVIS]

[18 U.S.C. § 3147]

[Commission Of Offense While On Pretrial Release]

52.  The Grand Jury hereby realleges and incorporates by reference paragraphs 1 through 10, 12 through 20, 22, 25 through 27, 29 through 31, 33 through 34, 36 through 38, 40 through 41, and 43 through 44 of this Indictment as though fully set forth herein.

53.  At the time of the offenses charged in Counts One through Three, Five through Six, Seventeen through Eighteen, and Twenty-Six through Twenty-Seven of this Indictment, defendant MENDIRATTA was on pretrial release under Title 18, United States Code, Chapter 207, in the federal criminal case of United States v. Tarun Mendiratta, CR 09-715-TJH (C.D. Cal.).

54.  At the time of the offenses charged in Counts One through Four, Nine through Sixteen, Nineteen through Twenty, Twenty-Two through Twenty-Six, and Twenty-Nine of this Indictment, defendant MOYAL was on pretrial release under Title 18, United States Code, Chapter 207, in the federal criminal case of United States v. Edon Moyal, CR 09-1336-JAH (S.D. Cal.).

55.  At the time of the offenses charged in Counts One, Four, Twelve through Thirteen, and Twenty-One through Twenty-Two of this Indictment, defendant MACKEY was on pretrial release under Title 18, United States Code, Chapter 207, in the federal criminal case of United States v. Ricardo Fernandez, et al., CR 11-62-PAC (S.D.N.Y.).

61

56.  At the time of the offenses charged in Counts One, Three, and Twenty of this Indictment, defendant DAVIS was on pretrial release under Title 18, United States Code, Chapter 207, in the federal criminal case of <u>United States v. Joey Davis</u>, CR 11-330-JHN (C.D. Cal.).

FORFEITURE ALLEGATION ONE

[18 U.S.C. § 981(a)(1)(C), 28 U.S.C. § 2461(c)
and 18 U.S.C. § 982(a)(2)]

[Criminal Forfeiture of Proceeds Obtained From Conspiracy,
Securities Fraud, and Wire Fraud]

57.  Pursuant to Federal Rule of Criminal Procedure 32.2,
notice is hereby given to the defendants that the United States
will seek forfeiture as part of any sentence in accordance with
Title 18, United States Code, Section 981(a)(1)(C), Title 28,
United States Code, Section 2461(c), and Title 18, United States
Code, Section 982(a)(2), in the event of any defendant's
conviction under any of Counts One through Twenty-Two of this
Indictment.

58.  Defendants REGIS POSSINO, GROVER HENRY COLIN NIX IV,
also known as ("aka") "Colin Nix," TARUN MENDIRATTA, IVANO
ANGELASTRI, MARK HARRIS, EDON MOYAL, JOSEPH SCARPELLO, JULIAN
SPITARI, PETER DUNN, WILLIAM MACKEY and JOSEPH DAVIS, aka "Joey
Davis," shall forfeit to the United States the following
property:

a.   All right, title, and interest in any and all
property, real or personal, constituting or derived from, any
proceeds obtained, directly or indirectly, as a result of any
offense set forth in any of Counts One through Twenty-Two of this
Indictment; and

b.   A sum of money equal to the total value of the
property described in subsection (a) above.  For each of Counts
One through Twenty-Two for which more than one defendant is found
guilty, each such defendant shall be jointly and severally liable
for the entire amount forfeited pursuant to that Count.

63

59.   Pursuant to Title 21, United States Code, Section 853(p), as incorporated by Title 28, United States Code, Section 2461(c), and Title 18, United States Code, Section 982(b), each defendant shall forfeit substitute property, up to the total value of the property described in the preceding paragraph, if, as a result of any act or omission of a defendant, the property described in the preceding paragraph, or any portion thereof (a) cannot be located upon the exercise of due diligence; (b) has been transferred, or sold to, or deposited with a third party; (c) has been placed beyond the jurisdiction of the court; (d) has been substantially diminished in value; or (e) has been commingled with other property that cannot be divided without difficulty.

FORFEITURE ALLEGATION TWO

[18 U.S.C. § 981(a)(1)(A), 28 U.S.C. § 2461(c)
and 18 U.S.C. § 982(a)(1)]

[Criminal Forfeiture of Property Involved in Money Laundering]

60. Pursuant to Federal Rule of Criminal Procedure 32.2, notice is hereby given to the defendants that the United States will seek forfeiture as part of any sentence in accordance with Title 18, United States Code, Section 981(a)(1)(A), Title 28, United States Code, Section 2461(c), and Title 18, United States Code, Section 982(a)(1), in the event of any defendant's conviction under any of Counts Twenty-Six through Thirty-Seven of this Indictment.

61. Defendants REGIS POSSINO, GROVER HENRY COLIN NIX IV, also known as ("aka") "Colin Nix," TARUN MENDIRATTA, IVANO ANGELASTRI, MARK HARRIS, EDON MOYAL, JOSEPH SCARPELLO, and JULIAN SPITARI shall forfeit to the United States the following property:

a. All right, title, and interest in any and all property, real or personal, involved in any offense set forth in any of Counts Twenty-Six through Thirty-Seven of this Indictment, or conspiracy to commit such offense, and any property traceable to such property, including all monies or other property that was the subject of, all commissions, fees, and other property that were derived from, and all monies or other property that was used in any manner or part to facilitate the commission of any violation of Title 18, United States Code, Section 1956; and

b. A sum of money equal to the total value of the property described in subsection (a) above. For each of Counts

65

1  Twenty-Six through Thirty-Seven for which more than one defendant

2  is found guilty, each such defendant shall be jointly and

3  severally liable for the entire amount forfeited pursuant to that

4  Count.

5      62.   Pursuant to Title 21, United States Code, Section

6  853(p), as incorporated by Title 28, United States Code, Section

7  2461(c), and Title 18, United States Code, Section 982(b), each

8  defendant shall forfeit substitute property, up to the total

9  value of the property described in the preceding paragraph, if,

10 as a result of any act or omission of a defendant, the property

11 described in the preceding paragraph, or any portion thereof

12 (a) cannot be located upon the exercise of due diligence; (b) has

13 been transferred, or sold to, or deposited with a third party;

14 (c) has been placed beyond the jurisdiction of the court; (d) has

15 been substantially diminished in value; or (e) has been

16 ///

17 ///

18 ///

19 ///

20 ///

21 ///

22 ///

23 ///

24 ///

25 ///

26 ///

27 ///

28 ///

1  commingled with other property that cannot be divided without

2  difficulty.

3

4                                        A TRUE BILL

5

6                                        /s/
                                   _____
7                                  Foreperson

8

ANDRÉ BIROTTE JR.
9  United States Attorney

10

11 ROBERT E. DUGDALE
Assistant United States Attorney
12 Chief, Criminal Division

13 RICHARD E. ROBINSON
Assistant United States Attorney
14 Chief, Major Frauds Section

15 STEPHEN A. CAZARES
Assistant United States Attorney
16 Deputy Chief, Major Frauds Section

17 JAMES A. BOWMAN
JEREMY D. MATZ
18 PETER W. BALDWIN
Assistant United States Attorneys
19 Major Frauds Section

20

21

22

23

24

25

26

27

28

                                        67